THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MAURICE HAYNES, Defendant-Appellant.

(No. 53973; ▮▮▮▮▮▮▮▮

First District—November 23, 1970.

Gerald W. Getty, Public Defender, of Chicago, (Fred Shandling, Theodore A. Gottfried, and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Elmer C. Kissane and John Gibartis, Assistant State's Attorneys, of counsel,) for the People.

Mr. PRESIDING JUSTICE BURMAN delivered the opinion of the court:

The defendant, Maurice Haynes, was indicted for the crimes of forcible rape and of robbery. After a trial without a jury he was found guilty on both charges and was sentenced to concurrent terms in the penitentiary of 4—10 years for the crime of rape and 2—5 years for the crime of robbery.

The sole issue presented on appeal is whether the uncorroborated identification by the complaining witness is so unsatisfactory that it creates grave doubt of the defendant's guilt.

We briefly summarize the evidence. Vera Young (formerly Vera Ford), the complaining witness, testified that on March 3, 1968, the date of the crimes, she was single, aged twenty-one, five feet tall, and an employee of the Post Office. She completed work and left the main Post Office at 3:42 A.M. on March 3, 1968. She arrived at the 55th Street L station at about 4:15 A.M. and proceeded to walk in a westerly direction along 55th Street until she reached Michigan Avenue. As she turned the corner onto Michigan Avenue, she heard footsteps behind her. She stopped and saw a man. The man said something to her, and as she was about to ask him what he wanted, he grabbed her around the neck and said, "If you want to live don't scream, I have a knife." The two of them walked into a yard at 5504 South Michigan Avenue where the man asked her if she had any money. She told him that she had $20.00 and tried to give him the money. The man replied, "No, the police might see us. Let's walk down the street." The man then took her behind the building at 5522 South Michigan Avenue; struck her on the head; threatened that he had a gun (which she never saw); took her money and watch; and told her to pull down her underclothing. She refused, but he beat her, pulled down her underclothing and had intercourse with her. The man had difficulty having intercourse because she was short and because they were both standing. The man had her put her clothes back on and took her out to an alley. He stopped under a light "and he looked at me and I looked at him." He then led her to the basement stairway of a building on 55th Street. There she took off all of her clothing except her bra and slip which he ripped off of her. The man had intercourse with her again. She took a pin which had held her slip to her bra and attempted to stick him in the eye. She felt the pin strike him, but did not know where the pin had struck. He jerked his hand to his head, and she attempted to escape. He caught her, knocked her to the corner, and started to kick her. She screamed and he ran. Even though she was wearing no clothes, she chased him down the building corridor. She asked a lady who opened a door to call the police. After the man had gone she sat on the stairway, and a lady brought her a robe.

The police took her to the hospital where she was examined, but not treated. While she was at the hospital, she described her assailant to the police as very tall, light brown skin, dark overcoat, dark pants, thin mouth which looked as if he didn't have any teeth in the top or they were very small. Later she went to the police station where she was shown slides of a number of men. She was not shown a picture of Maurice Haynes, and she did not identify any of the men as her assailant.

In the days after the attack she searched the neighborhood bars, taverns, and pool halls in hope of finding her assailant. On Friday, March 8, 1968, she heard the defendant's voice while she was in a beauty parlor. She looked, saw the defendant standing in front of a pool hall adjoining the beauty shop, and recognized him as her attacker. She followed him and informed a policeman who was sitting in a parked police cruiser that the defendant had raped her. The policeman waited for assistance and then arrested the defendant.

At the trial, on January 6, 1969, Vera Young identified Maurice Haynes as her assailant. She testified that she had seen him on two occasions prior to March 3, 1968. The first time was during the summer or fall of 1967 at the L station on 55th Street. He said something to her, but she just walked away. The second time was some two months later at 55th Street and Michigan Avenue. He asked for her name, which she did not give, and he asked her if he could pick her up after work in his Cadillac and "stuff like that." She refused the offer, talked to him for about a minute and then walked away.

She described her assailant and specifically stated that he was clean shaven and that he appeared to be in his early twenties. The complainant was cross-examined at length concerning her assailant's teeth.

"Q. Tell me some more about this man's physical anatomy. Was he missing some teeth in the front?

A. When I first—the way he was holding me and the way I looked up at him he looked as if he didn't have any front teeth or they're very small.

Q. How many teeth would you say were missing?

A. I didn't say any were missing. I said it looked little—

Q. Didn't you tell the arresting officer the two front teeth were missing?

A. No, I didn't.

Q. But there were some teeth missing, right, you don't know how many?

A. I don't know.

Q. What is that?

A. I don't know.

Q. Did you see inside the assailant's mouth?
A. I didn't see his teeth.
Q. None of them?
A. Maybe his bottom teeth, but I didn't see his top teeth.
Q. Were any of those missing?
A. Not that I remember."

Williams Strocchia, a police detective, testified that he interviewed the complainant in the early morning of March 3, 1968, at Billing's Hospital and that Vera Young at that time had bruises about the face, arms, legs, and ankles. Other officers testified that they had arrested the defendant.

Maurice Haynes, the defendant, took the witness stand on his own behalf. He denied that he had committed the crimes and that he had ever seen or talked to the complainant prior to March 8, 1968, when he was arrested. He testified (1) that he had a moustache since he was 12 years old; (2) that he was 17 years old on March 3, 1968, and (3) that he was at home and asleep at the time the crime was committed. Many witnesses, including the defendant's parents testified that they saw the defendant in his home early on the morning of March 3, 1968, and that he had gone to bed at about 3:00 A.M.

Edward Kodath, one of the police officers who participated in the defendant's arrest, testified for the defendant. He testified that Vera Young had described the events of March 3, 1968, to him. Defense counsel questioned him concerning her description of her assailant's teeth.

"Q. Now had the complaining witness told you that her assailant had two missing front teeth?
A. She indicated that he apparently had either two missing front teeth or missing front teeth on top.
Q. Two or more, is that correct?
A. She indicated it could have been two or it could have been all. She didn't notice any teeth."

On redirect examination he testified that the defendant did not have a moustache on March 8, 1968. On recross examination he testified that the complainant never faltered or equivocated in her identification of the defendant.

The conviction in this case rests solely on the complainant's identification of the defendant as her assailant. The testimony of a single witness, even though contradicted by the accused, is sufficient to sustain a conviction if the testimony is positive and the witness is credible. *People v. Hampton* (1969), 44 Ill.2d 41, 253 N.E.2d 385.

The complainant had an adequate opportunity to see and observe her assailant. Her encounter with him was lengthy. The assailant stopped

her in the street and pulled her into a yard. After a short exchange of words the two of them moved down the street to another location where the assailant robbed and raped her; they then moved to another location where he again raped her. At one point they stopped for a moment under a street light, and she saw him under well lighted conditions. The complainant was certain that she could find her assailant. She searched for him and found him without the assistance of the police. Her search was careful and her identification was discriminating. The police had shown her slides of men fitting her description of her attacker, but she had not identified any of these as her assailant; she had searched for five days before finding and identifying the defendant. She never equivocated in her identification of the defendant.

■■ The defendant contends that material discrepancies exist between the description given by the complainant and the actual appearance of the defendant which discredits the complainant's identification of the defendant. It is argued that she described him as missing some or all of his front teeth, while he has a full set of teeth. This argument misconstrues her testimony. She related that he held her in such a way that she could not tell whether he had any front teeth. Officer Kodath's testimony does not contradict this. Her observation, under the circumstances, is not inconsistent with the young assailant's having a full set of teeth. The defendant further argues that she said he was clean shaven when in fact he had a moustache. The record does not sustain this argument. The complainant testified that he was clean shaven on March 3, 1968. Her testimony was corroborated by Officer Kodath, the defendant's witness. He testified that when the defendant was arrested five days later he had no moustache and when he subsequently saw him in the Boy's Court he did not have a moustache. He observed that the defendant had a moustache at the trial. The defendant also argues that the complainant failed to mention certain scars which he had on his face. There is no evidence in the record to show defendant's face was scarred on the day the crimes were committed. The defendant finally argues that complainant estimated that her assailant was in his early twenties while he was only 17 years old at the time of the crime. This slight discrepancy does not discredit the identification. We note that the complainant estimated that the defendant was aged 21 at the time of the trial.

■■ The defendant next contends that the complainant's encounters with the defendant prior to March 3, 1968, "had either some conscious or unconscious impact on her," and that her identification of the defendant was the result of "unconscious transference." A reviewing court is particularly ill equipped to assess the psychological operation of a wit-

ness's mind. Arguments like this are better addressed to the trier of fact who must assess the credibility of the witnesses. (See *People v. Moore* (1969), 42 Ill.2d 73, 246 N.E.2d 299.) The fact that the complainant did not mention to the police that she had seen the defendant before March 3, 1968, in the circumstances of this case, does not discredit her identification. She had encountered the defendant only briefly, and the meetings occurred months before the crime. She did not know the defendant's name or his address. This situation should be carefully distinguished from *People v. Roe* (1965), 62 Ill.App.2d 452, 211 N.E.2d 552 where the complaining witness knew the name of his assailant and failed to reveal his name until 16 days after the police questioned him.

■■■ The defendant finally contends that the alibi evidence is credible and corroborated. The alibi evidence at most created a conflict between the testimony of the complainant and the testimony of the defendant and his witnesses. The trial judge believed the positive identification by the complainant to be credible and disbelieved the defense witnesses. It was the function of the trial judge to resolve conflicts in the testimony, and he was not obligated to believe the defendant's alibi over the positive identification by the complainant. *People v. Speck* (1968), 41 Ill.2d 177, 242 N.E.2d 208; *People v. Setzke* (1961), 22 Ill.2d 582, 177 N.E.2d 168.

■■ We have reviewed the entire record and considered the arguments presented by the defendant. After carefully examining the totality of the complainant's testimony relating to her identification of the defendant, we are of the opinion that her testimony, if believed by the trial judge, was sufficient to support the defendant's conviction. We have examined the cases cited by the defendant and find them inapplicable on the facts. The circumstances existing in those cases do not exist here.

For the foregoing reasons the judgment of conviction of the Circuit Court is affirmed.

Judgment affirmed.

MURPHY and ADESKO, JJ., concur.